Thank you, Your Honors. I'm Randy Lowne, and I'm appearing here today on behalf of Ms. Buteris. This is an employment law case where my client has the worst of all cases. He didn't get fired. But he did have retaliation taken against him. We have a gentleman who comes in as a new principal to the junior high in Bremerton. The gentleman is Mr. Simon. When he comes in, he tells people right off the bat he's got a mandate to get rid of the dead wood and straighten out the older teachers. My client was considered one of the older teachers. He'd been teaching for a long period of time. Mr. Simon, in addition to making comments such as getting rid of the ripe and rotting versus the green and growing and making statements to others about older teachers don't teach as well. OK, well, that that may be relevant, but I mean, the ripe and rotting is sort of a general exhortation. You know, we're either green and growing or ripe and rotting. And I just don't think under our case law that gets you very far. Also, as I understand it, that phrase was used in in Simon's letters to everybody. Isn't that correct, that he used that phrase like in a letter about reviews to all the teachers? He did use it once in a letter to reviews to all the teachers. So he used it to all the teachers, young and old, you know, every race, every level of experience. Then how does it show age discrimination? It doesn't seem like it's pertinent to that. Well, I think it would be up to the jury to decide whether it's pertinent. And the reason why is because he might be very smart at covering his tracks. He used the statement ripe and rotting to older teachers and realized his mistake. So he sends it out in a letter to everybody. Gee, that covers it up. And that's why I think that part's a jury issue. But one of the problems we had here is we had a bunch of teachers who were aware of facts based on their experiences, based on what had gone on, who the court said were we were trying to submit expert opinion, not lay testimony. And the reality is, is it was lay testimony because it is the basis of their everyday job. They see evaluations. They see teachers' plans. They see what's going on. And they were talking about their own experiences and their own knowledge of how the system works. And yet all of that was excluded by the trial court in an attempt to call it expert opinion rather than lay testimony. We believe it's lay testimony under the rule. So in one case that I didn't cite in my brief and I would like to bring to the court's attention, the Sealand Service Inc. versus Lozen International, 285 F. 3rd, 813 and 821, a 2002 case. And in that case, they discussed the aspects of employment. People can talk about their employment and what goes on in their employment when it's an employment case and it's an employment issue. And that's what these teachers did. Now, in addition to age discrimination, including the fact that seven teachers over the age of 50 were run out of the school, including the fact that my client was on the short list and all of a sudden lost his professional growth program where he did not have to be evaluated on a yearly basis. I think they said his plan was submitted two days late. Something that had never been an issue in the past became an issue. Then my client got his first bad evaluation ever in his entire history of teaching by Mr. Simon. It had three matters of that. My client was involved in his church. He is the head of the congregation at the time. And when he was involved in it, Mr. Simon made some comments such as he's involved with his church. He doesn't have time to teach. He made comments. He has a son on a Mormon mission, and therefore, that's the only reason he is teaching. He made another comment that he was an atheist.  There's absolutely no showing that it impacted anything on the school district as a result of his working with his church. But Mr. Simon claimed it did. And when he did so, brought in the category that the church participation was having an impact on his work. I didn't see in the maybe I missed something, but I didn't see like a claim by pellet that these comments about his religion or comments about, you know, the fact that he couldn't have time to be a bishop in the Mormon church if he was teaching or vice versa. He didn't seem to contend that created a hostile environment where he couldn't work. It seems like he just is presenting that as evidence of bias of Mr. Simon in giving him a bad evaluation. Am I right in that? Well, not only did it was. Did he ever make a hostile environment type claim? It's not specific that it was a hostile work environment, but he did contend that this was a series and pattern of acts in which he was attempting to get Mr. Gutierrez to leave trying to push him out, trying to drive him out of school. But I thought that your main point was by he was trying to do that by giving him a bad evaluation and loading him up with an improvement plan. I thought newly onerous. He wrote up an improvement plan that I could not find a single teacher. And there are numerous declarations who believe that this thing was anything but designed to drive the teacher out. Nobody had ever seen anything like it before, that it was it. He graded him down in every single aspect of his employment. Every category. How do you answer the argument of the school district that in addition to Simon giving a negative evaluation, that there were two other evaluations? I guess one was that Mr. Edwards, Mr. Edwards, and then another by I forget the person's name, but but there was a third one. The third one was Mr. Simon's protege, the gentleman who had made assistant principal under the rec tutors of Mr. Simon and who owed his career to Mr. Simon and who came in. He only wrote up 11 violations, 11 categories of poor performance. Whereas Mr. Simon was hitting every single level. Mr. Edwards was somewhere in between. And I don't remember the exact number, but Mr. Edwards was with the school district, was brought in. He had been one of the people who helped bring Mr. Simon in. He was an administrator. And you will recall that Mr. Simon told people when he first got there that he was brought in to clean up and make the older teachers shape up. Now, if there's anything that tells you the school district's got a policy that's aimed towards older teachers, make sure the older teachers shape up. These are the experienced teachers. Among the declarations we put in, there was a gentleman from another school district who was brought in by the union to do an evaluation to see how he performed his job. He regularly did that in his normal course of business, who had evaluated many teachers, who had seen many science teachers classes. My client was a science teacher. And as a result, it's a little bit unique in the way it's taught. But he came in and he saw absolutely no violations of any district policies. He saw nothing that indicated he found the kids were energetic. They enjoyed the process. They were actually learning. Of course, I'm not sure that's the goal of schools anymore. However, in this case, the school district argues that the other teachers who say that the appellant's teaching is fine don't have training as as administrators or evaluators. Yes, they did argue that case. However, the gentleman that was brought in from the peninsula school district did have experience as evaluator and had done over 30 evaluations of teachers and wrote a report and sat in his classes and said there was absolutely nothing wrong with my client's style of teaching. In fact, that he found it very invigorating for the kids. So they made that claim, but it's not accurate. And the another thing I want to get to is what they did to him while he was gone visiting his father in the hospital in Yakima. My client's over in Yakima and he is visiting his father who's in the hospital. His wife gets a phone call at home on Friday afternoon. And Mr. Simon tells my client's wife that he has been accused of sexual assault on students. Leaves a number. My client's wife had said, I have a number where you can be reached. You want to talk to him? No. My client gets this call. Here's this outrageous statement. He tries calling the school superintendent, Carol Whitehead. He tries calling the school administrator. He tries calling Mr. Simon. All weekend he is left with this. Somebody has accused him of sexual assault on a student. Come in Monday morning and find out that one of the kids had come up during roll call and said, somebody's picking on me. And he said, can it wait until roll call's over? And she didn't come back. And it turned out the kid picking on her had squeezed her breast. It had absolutely nothing to do with my client having any inappropriate conduct. My client, as head of the church, stepped down from his position until this matter could be investigated. This was outrageous conduct. Is there a fact dispute as to what Mr. Simon said to your, to a felon's wife? Actually, there is. And he claims that he had a script that was given to him by Carol Whitehead. Carol Whitehead, in her deposition, denied that she gave him the script. What does he say the script was? Merely that there was an accusation of sexual assault from his classroom, not that he had done it. Not that he did it. And her testimony is direct opposite. He said it was him who did it. And that's my client's wife's testimony. And so there is a disputed issue of fact there. And that conduct is so outrageous, I don't think there's any basis for the denial of the court of outrage. And if anything, if there wasn't a federal cause of action, it should be kicked back to state court. But in this case, it was dismissed. I haven't come to rest as to what the significance of this kind of factual dispute is. But I mean, I could imagine it's at least possible that someone calls up and they say to his wife, there was a sexual assault and they think you're the teacher, your husband was to blame for it. Because he didn't. They're thinking because he didn't stop somebody from doing something or didn't take action when this girl came up there. But it's misinterpreted, you know, interpreted as he did an assault. But what does the record really tell us about this? She tells us that his wife says Simon said he did a sexual assault of two students and sight. And Simon says, I didn't say that. I had a script given me by the administrator. I just said there was an assault in the class. And the administrator says I never gave him the script. Yes. So that's all we've got on that issue. It is. And I think, taking it to the light and most favorable to the plaintiff in this case, clearly that's sufficient to go to a jury, for a jury to decide it. Because if my client's wife's statement is true, and she's a party to the action, if my wife's client's statement, yeah, my client's wife's statement is true, then clearly Simon made an allegation that was career-ending, that was criminal, that was everything negative that could possibly occur. And it was devastating to my client. And then ordered that he not come to the school, not contact anybody but a select few, none of whom were available. So my client went through the whole weekend under the impression that somebody had accused him of this. It was outrageous. And what claim would go to trial to present that issue? That is the Washington State claim of intentional infliction of emotional distress. Which has to be something very extreme. It does. I'm saying this fits in that. I'm saying it does. If it was done intentionally and falsely. And if you take a look at what Simon was doing, everything he was doing was building on trying to get Mr. Buteris to quit. He gave him the negative evaluation. Took him off the PG program. Gave him another negative evaluation. Gave him an extreme plan of correction. All of which are designed and are in the same manner as which the other instructors who were forced out, who were the older teachers in the school, all of them were forced out in the same manner. I mean, it is a step-by-step plan how to get rid of a teacher. And my client was put under emotional distress by all of those factors and then get hit with this call. It was extreme. And it's something that shouldn't be tolerated. And I'd like to reserve the rest of my time for rebuttal, if I may. You may. Thank you. Mr. Sale. May it please the Court. I am Jerry Sale. I'm here on behalf of the defendants, Bremerton School District, Whitehead, and Roberts. I've also been allocated 20 minutes, the whole 20 minutes, to speak also in favor of the position of Defendant Simon. So I'll be speaking on behalf of all defendants in regard to this. A number of issues were raised by the opening here. And I think what Mr. Lown has tried to do is to paint a big picture and to make levels of connection that aren't really borne out by the facts. And, in fact, he plays a little bit fast and loose with how he does present those facts. But there are a number of issues in this case, and I can't treat all of them in the 20 minutes, running from those which are simply looked at by you for abuse of discretion to ones that are reviewed by you de novo. I think the evidentiary issues looked at for abuse of discretion are largely irrelevant. That is, regardless of how that decision is going to be made, the substantive issues would still be decided in favor of defendants in this case. There's maybe one possible exception to that, and that's the statements by a number of other teachers that Mr. Simon targeted older teachers. I mean, wouldn't those would be if another teacher says Simon told me he's out to get old teachers. That's an admission. That's not hearsay. Correct. That would come in. I think the district court made an error in saying it has to be an admission of the opponent who's like the person speaking. So that would be the judge should have let that in. Well, in regard what I have here in regard to statements that were made by Mr. Simon are the ripe and rotting one. Right. That you already addressed. There was one by one teacher that he told her that he was targeting old old teachers or well, old teachers weren't as good or something like that. And the other one that I have is, in fact, a statement that he made that his wife had conducted a study and that study showed that teachers as they aged became less effective. OK. But how did that. How does that connect. No. Who tried to present that evidence that evidence that he made this statement to his wife. No, no, no. That that evidence. That statement was made to, I believe, Karen Gentry. It may have been by Simon. By Simon. That he had told his wife that. No, his wife, Simon's wife, that his wife had told him had conducted the discovery and had in that or a study. And that discovery disclosed that teachers are less effective as they age or perhaps as they stay on for a longer period of time. And relating that to. And he told somebody that he's telling that to someone and then they present that that probably comes in under the hearsay. I have no problem with that coming in. I have a huge problem with whether or not that does anything to prove discrimination or to defeat pretext. But I don't have a problem with that coming in. Absolutely right. I have to say that in regard to the statement that was made today and Mr. Lown was quoting from something that said he said he came in to clean up. And to the language of something straighten out the older teachers. I didn't find that in the record. It's not in the briefs. If it's in the record, I don't know where it is. And perhaps Mr. Lown can tell us that there is in the record that he came in to clean up. I don't have anything that I've seen that refers to older teachers in regard to that statement. In this case, obviously, for the age discrimination claim, and I'm looking at that particularly because of that particular evidentiary question, in regard to the age discrimination claim, the prima facie case is he's over 40, over 40, that he's performing his job satisfactorily, that he suffered an adverse employment decision and that age was a substantial factor in that employment decision. The first one is satisfied in this case. Mr. Buteris was over 40. Other than that, there is no evidence to show that any of the rest of that prima facie case can be satisfied. In this case, there was evidence in regard to whether he was performing his job satisfactorily, that he did in fact miss two meetings admitted, and there may have been others, that he did have a problem falling asleep, falling asleep at meetings, in the classroom, and in assemblies. Mr. Buteris said he was merely dozing off. I think that's probably a distinction without a substantial difference. He did have a spate of injuries in the classroom and occurrences, biting, the sexual assault thing, which was slightly misrelated by Mr. Lown. According to what evidence is in the file, it wasn't that he said, come back to me after roll call. He said, sit down. And he didn't go then address that to the student afterwards. Did the student say, I need to tell you, I'm being sexually assaulted. I don't believe so. I believe she said she needed to talk to a student comes up and says, I need to talk to you. And he says, sit down. It doesn't seem to me he can be criticized for that. If that may be right. But the point is, in this case, he was criticized for that because it resulted in in that instance, a sexual assault within his class. And that was one incident among others, including where somebody stuck a pencil in the neck of another student. Another instance in which a student was bitten in his class. Another circumstance where a child said you can yell at him and he doesn't pay any attention to you. You can call him names and he doesn't hear you. There was these instances of lack of attention. Now, I think people can disagree whether that was a serious situation and that he handled it correctly. But even his experts said that if somebody comes to address something to you and you say to them, you need to sit down because I'm taking role. You do need to follow up on that because it could be a serious situation. I don't think the record reflects more facts about how agitated she was or what the other concerns were. And I don't think we know today exactly what that is. And we also have information that he didn't take corrective actions in regard to some things. I'm not talking about the plan of improvement. I'm talking about other things that he just needed to do to take corrective action and to do it in time. So these are things that do indicate that he was not performing his job correctly. And as this case reaches us, reaches this court now, we don't really need to look at whether that's a prima facie case, but we can look at it as whether or not that's that those reasons are pretext for something else. The next one, however, is whether there's any adverse employment action taken in this case. And there really isn't. There's no demotion. There's no passing over for promotion. There's no discharge. There's no constructive discharge. And I think this may be the most important point. There's no action taken that, had he left his employment, would constitute a basis for constructive discharge. Okay. Well, as I understood his side of the case on this issue, it is that he testifies that given this improvement plan he got, instead of going home at 5 or 6, he's down there till 7 to midnight, day after day. So it's a practical matter to comply with the improvement plan. He's working longer hours. That's kind of the gist of it, as I understand. I understand. I think the record, in fact, was the stress of not knowing if he can satisfy anyone. And then he's got some other teachers come in and say the plan, at least in their opinion, is too, too strict or requires too much. And maybe the judge excludes, excluded that, did he? Or did the judge accept that testimony? I think the judge excluded that testimony as well, of the teachers coming in afterwards and saying that plan's the worst one I've ever seen. I believe the record shows, in fact, through some of the deposition testimony, that, in fact, he did not have to respond to the plan for improvement. That he talked with others at the school, including Mr. Welsh, with whom he developed, I think, a satisfactory relationship. Mr. Welsh was the one who did the third evaluation, who Mr. Long characterizes as the protege of Mr. Simon. And I think he worked out a satisfactory situation in which he could address some of the issues, but not all of the issues on the plan for improvement. I think the situation, in fact, in regard to his working longer hours had to do with preparing lesson plans that came up before that time, if I'm not mistaken. I could have that record wrong, but I believe, in fact, that's what it will reflect. So he was working harder, and he was working harder at doing lesson plans and those things to prepare for the classroom. Now, the question is, I suppose, when does that become an adverse employment action? Because not everything that an employer does when he gives a bad evaluation can constitute, then, I think, an adverse employment action for the purposes of a discrimination claim. I think it has to be more than that. And I would suggest, and I'm looking at the argument of the case that came before this, where the question was, was there even a constructive discharge? In this case, there clearly wasn't that. But I would think that the level of the materiality would have to rise to the level of. Something more than an improvement plan. Exactly right. Let me ask you this. If we accept your client's position on that, does that resolve the both the age discrimination and the discrimination based on my religion type claim? Do they both require like an adverse employment action? If we accept. Yeah, I'm. It's a great question. I wish I had an appropriate answer. Now, my question is, assuming that we agreed with you on that. What about this state law claim for intentional infliction of emotional distress? And Mr. Lowndes' argument that there's an outrageous statement that, according to Mrs. Boutheris, is made to her that her husband has sexually assaulted two students, or that's being investigated. How do you deal with that? Sure. I think that question actually is the most difficult question before the Court today. I think the other questions are easier, and I haven't finished my remarks in regard to those and would be glad to finish that. You can do that and then come back to this. Okay. In regard to the Federal claims, all of them, the last point was whether or not there was any discrimination shown. And so whether or not there's any proof that these legitimate reasons for monitoring the performance of Mr. Boutheris are merely pretext for some sort of discrimination. And in regard to that, I would like to address that and say, and I'll look at it more particularly, maybe come back to that. But in general, speaking generally in regard to all of these, there isn't any showing of discrimination. There is showing of stray comments. But there's not the showing of the nexus that needs to be made between those comments and any adverse employment action taken, including the lesson plan or the plan of improvement and so on. And that's what this Court requires in order to make one of these Federal claims. The cases are clear about this, that these anti-discrimination laws or even the constitutional protections do not protect you against a harsh environment. It doesn't protect you against even arbitrary decisions that have been made. What it protects you against is discrimination or unconstitutional action. And there's no proof of that in this case. I'm going to skip for a moment and go over to the State law claim, and then I'll go back to that if I may. The State law claim is different in character because it's based upon this one instance in which, according to Mrs. Boutheris, Mr. Simon called her up and said, your husband has been accused of sexual assault. And she even said that she was told it involves two suits. The testimony from Mr. Simon was that he had talked this over with Mrs. Whitehead, the superintendent, before he called about this incident, and that he had prepared remarks to talk to Mr. Boutheris about, not to Mrs. Boutheris. And that Mr. Roberts was in the room with him, and he called her up and told her about this incident where two students had been involved in sexual assault in Mr. Boutheris's classroom. He said Roberts was in the room with him when he called Appellant's spouse. That's correct. He called for Appellant. Appellant's not there. He talks to his wife. That's right. What Mrs. – what Mr. Boutheris alleges in this case is that what Mr. Simon did at that point is deliberately say something false. To Mrs. Boutheris. And what she repeated was what he said. Not what she thought he said, but what he said. That's what their allegations are. What I think the court did in this case, looking at the court's ruling, is the court decided that under these circumstances, really reasonable minds cannot disagree, that there was a misinterpretation about what happened in this situation. And under those circumstances, it doesn't meet outrageous behavior. I don't think the court tried to decide that if Mr. Simon were purposefully calling Mrs. Boutheris and lying to her and then preventing her from finding anything out over a period of time, that that wouldn't be outrageous. I don't think the court said that. I think the court said clearly here there's a misinterpretation and it doesn't arise – doesn't rise to the level of outrageousness that's required under that State law. One of the things the court did not treat in regard to that also is the second requirement of the tort of outrage or intentional infliction of emotional distress is that there be severe emotional distress. And I don't think that's addressed in the record as relating to that particular weekend. If I may then go back. I was trying to address your question. Did I address that sufficiently? I'll go back just a moment then to the pretext argument. What Mr. Boutheris then tries to show in regard to pretext here I think are essentially three things. There are the stray comments that we talked about. There's the question that Mr. Simon was wrong in his evaluation. And there's the third thing, the comments from the teachers, the other teachers, that they think in their opinion Mr. Simon is targeting older teachers. We talked about the stray comments. The cases are replete. The stray comments are not enough. There must be a nexus shown between the comment and the discrimination. And that's not been done here, not at all, in any regard, in regard to the religion, in regard to the age discrimination, any of them. In regard to Mr. Simon was wrong, again, the courts are uniform that what must be shown is not just something about the business dispute. It must be – it can't just be about that. In order to show pretext, you must somehow from that show an inference of discrimination. And that's not – that's not done in this case. Anti-discrimination laws don't protect against the kind of situation where there is a personality conflict. It protects against discrimination. And you don't get anywhere by proving only that Mr. Simon was incorrect when he made his determination. But we also have the situation, as you pointed out, that there are two other evaluations that were done during that time. Mr. – Mr. Gutierrez hopes to show that, well, finally, he ended up with a positive one. And his – he'd like you to infer from that that the positive one simply occurred because somebody else is now taking a look at him. But in fact, he was working on a plan of improvement for a period of time, and that may have influenced the positive one. We don't know. We certainly know that people other than Mr. Simon found negative evaluations, found reasons to evaluate him negatively at that same time. And finally, the opinion of teachers. The main thing about those opinions, they can't be used for habit. They can't be used for the purpose of showing character. They can be used to show intent if they're admissible. And the problem with them being admissible here is they're merely conclusory. We don't know anything about that. We don't know anything about what – what kind of evaluations those other teachers received. We don't know how he treated teachers that were younger. We don't know who we're – who we're talking about. We don't know where they went or whether there was any adverse employment decisions as to them and so on. These are conclusory allegations that are – don't have sufficient information behind them to allow them in as opinions. They're not adequately supported to be as opinions. Certainly in this case, even if you disagreed with the trial court, the trial court was well within its discretion in – in discounting that evidence by those teachers simply saying, I think he targeted older teachers. And it's also important that if you look at every one of those declarations, they say mainly or chiefly or in the majority or something of that sort. They always qualify, in fact, because, in fact, they're conscious that teachers other than older teachers, I think, were affected by Mr. Simon's attempts to, shall we say, clean up. And my time is expiring. Thank you very much. I appreciate your argument. Mr. Lalonde, you have a few minutes left. You did ask as to where it appeared in the record, and counsel asked me if I'd set it forth. So if you'll look to page 32 of my brief, you'll see under item number one the testimony by Diana Coombs, and the last name is S-C-I-U-T-T-O that Simon told her that he had been hired as principal at B-J-H, which is Bremerton Junior High, to clean up the school and make the older teachers shape up. That's where it came from. It's from her declaration. I hate to leave something hanging where you've asked a question that doesn't get answered. In this particular case, I don't believe that the court should have excluded these declarations from these teachers about what they were seeing, about what was going on, and what their experiences at the school had been. That's lay testimony. It was excluded. I think it has to go back. And I would ask this court to reverse and to send it back for trial, or at least, at the very least, to have the judge evaluate those, although I hesitate to ask for that, as to whether or not that would have changed his opinion. You know, on your state law claim for intentional infliction of emotional distress, I guess the district court's opinion just says there was obviously a misinterpretation of what was said. Sounds to me like he made a factual determination. Well, I don't know. That was the province of the jury. It might be, but he also said, and tell me how you answer this. He said there's no evidence of intentional misrepresentation. In other words, even if what Mrs. Boother has said was said actually was said, there's no evidence that Simon did this intentionally. Like, for example, he could have misspoken, you know, your husband didn't stop a sexual assault, or we're investigating whether he was the cause of it, is different than saying he's being investigated for sexually assaulting. But, you know, it could be Simon misspoke. But let's say he misspoke. But it wasn't. What's the evidence of intentional misrepresentation? Again, I think this goes to the motivation. And if you're talking motivation, it's a jury question. But we have a pattern of activity by Mr. Simon towards Mr. Gutierrez. He has written him a bad evaluation. He's taking him off PGP. He's gotten him put onto a plan where he has to do a plan of improvement, which is a step towards retirement. All of this thing is occurring. And then he does this phone call. If you look at it in the context that he's trying to drive Mr. Gutierrez out of the school, he's hitting him at an emotional low point. He knows he's over-visiting his father who's hospitalized. And he is hitting him with something very damaging and very, very destroying to a man of his stature. Now, was somebody with Simon? I took that from the argument. I believe that there is that position in which Mr. Edwards claims that he was present. And what was his version? Because we got we got Mrs. Boothurst's version. We got Simon's version. What did Edwards say? If my recollection is correct, and then you can check the deposition. But I believe he said that there was a script that he read from the script. However, Mr. Simon also told us he got that script from Carol Whitehead. Carol Whitehead said no, she didn't. No, he didn't. Did she say he didn't or she didn't recall? She said she didn't give him a script. OK. Thank you. Thank you very much. Case is submitted. We appreciate the excellent argument of both sides. All rise.
judges: Lay , Ferguson, Gould